UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------

LOUIS J. CIOFFI, III,

              Plaintiff,

    - against -

AVERILL PARK CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION and AVERILL PARK
HIGH SCHOOL and AVERILL PARK
CENTRAL SCHOOL DISTRICT,

              Defendants.
------------------------------------------------------


           DEPOSITION of JOHN SLYER, conducted

pursuant to Notice on Wednesday, March 4, 2004, at

9:00 a.m., at the law offices of Cooper, Erving &

Savage, LLP, 39 North Pearl Street, Albany, New York,

before Marcia Ross, Court Reporter and Notary Public

in and for the State of New York.


                * * *



1      APPEARANCES:

2          COOPER, ERVING & SAVAGE, LLP
                Attorneys for Plaintiff
3               39 North Pearl Street
                Albany, New York 12207-2797
4               BY:  PHILLIP STECK, ESQ.
                     BRIAN W. MATULA, ESQ.
5
           WHITEMAN, OSTERMAN & HANNA
6               Attorneys for Defendants
                One Commerce Plaza
7               Albany, New York 12260
                BY:  BETH A. BOURASSA, ESQ.
8                    JOHN P. CALARESO, JR.

9          RAPPORT, MEYERS, WHITBECK,
           SHAW & RODENHAUSEN, LLP
10              Attorneys for John Slyer
                436 Union Street
11              Hudson, New York 12534
                BY:  JASON L. SHAW, ESQ.
12
           ALSO IN ATTENDANCE:
13
                LOUIS J. CIOFFI, III, ESQ.
14

15

16

17

18

19

20

21

22

23

3

I N D E X

WITNESS                                          PAGE

    JOHN SLYER

        BY MR. STECK:                       5, 157

        BY MS. BOURASSA:                       127

        BY MR. SHAW:                          ---

--------------------------------------------------------

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Petition | 55 |
| 2 | 10/1/01  Letter | 125 |

--------------------

4

1                           STIPULATIONS

2

3                    It is hereby stipulated and agreed

4          by and between the attorneys for the respective

5          parties hereto that the signing and filing of

6          the Notary's Oath be waived;

7                    That the formal filing of the

8          transcript of testimony with the Clerk of the

9          Court be waived;

10                   That the examining party will

11         furnish the party examined with one copy of the

12         transcript without cost or charge;

13                   That all objections to questions

14         except as to the form thereof are specifically

15         reserved to the time of trial;

16                   That the testimony, when

17         transcribed, may be read by the deponent and

18         sworn to before any Notary Public or other

19         officer authorized to administer oaths.

20

21

22

23

1                        JOHN SLYER,

2          after having been first duly sworn by the Notary

3          Public, was examined and testified as follows:

4     EXAMINATION BY MR. STECK:

5          Q.    Mr. Slyer, can you give us your educational

6     background?

7          A.    I have a Mater's degree in Educational

8     Psychology and Statistics and I have a Bachelor's

9     degree in Biology and a certificate to teach secondary

10    education.  I also have an Associate's degree in

11    Liberal Arts from Hudson Valley and I have done quite

12    a bit of work with summer camp programs and have been

13    educated through other avenues, like the Red Cross and

14    American Camping Association in many different

15    respects.

16         Q.    Where did you get your undergraduate degree?

17         A.    Siena College.

18         Q.    And your Master's?

19         A.    SUNY Albany.

20         Q.    And are you presently employed?

21         A.    Yes, I am.

22         Q.    Where are you employed?

23         A.    North Colonie School District.

(John Slyer)                                6

1      Q.    Are you employed as a teacher there?

2      A.    Yes, I am.

3      Q.    What do you teach?

4      A.    I teach seventh grade Life Science.

5      Q.    Do you do any coaching there as well?

6      A.    Currently I am not coaching.

7      Q.    Have you in the past?

8      A.    I  have assisted in coaching the swim team

9   and I have coached modified swimming at Bethlehem.

10     Q.    There came a time when you became a member

11  of the Board of Education of the Averill Park Central

12  School District; is that correct?

13     A.    Yes.

14     Q.    When did you first run for the Board?

15     A.    Let's see.  That would be 2001, and it could

16  have been -- I started running in April 2001.

17     Q.    Was that the first time you ran for the

18  Board?

19     A.    Yes.

20     Q.    You were elected.  Then when did you take

21  office?

22     A.    I took office in July of 2001.

23     Q.    When you were on the Board -- Well, let's

(John Slyer)                                7

1      limit my questions to the time period from when you

2      took office as a Board member until the time that Lou

3      Cioffi's position was eliminated, as it were; okay?

4          A.     Yes.

5          Q.     Was there any discussion during the time

6      that you were on the Board during that period of any

7      criticisms of the football coach Kevin Earl?

8          A.     Yes.

9          Q.     What discussions do you recall?

10         A.     There were several discussions.

11                        MR. SHAW:  Give him a timeframe.

12                        MR. STECK:  It is hard for me to do

13                that because I don't know what went on at

14                the Board meetings.

15     BY MR. STECK:

16         Q.     Let's start with what the first discussion

17     you remember was after you came on the Board and

18     continue until you have completed your recollection,

19     and I will do some follow through.

20         A.     Okay.  In June, maybe even late May of 2001,

21     as an elected Board member they bring you in before

22     you take on your Board responsibilities.  So in May

23     and June I was in Board meetings and Executive

(John Slyer)                                    8

1    Sessions.  And the topic of the football coach and a

2    number of the different types of activities that had

3    occurred in the realm of coaching football involving

4    kids, some things about, you know, steroid use and

5    some other things related to the weight room and a

6    number of things -- and I can't recall all of the

7    details of it -- I haven't gone through and read back

8    my information.  But there were several discussions

9    about this and how there had been some disagreement as

10   to how to handle it.

11           That disagreement had come because Mr.

12   Cioffi had asked for some action and apparently there

13   wasn't any.  And so what was brought to my attention

14   at that time was that Mr. Cioffi would no longer be

15   responsible for supervising this coach.  And as a new

16   Board member I was trying to understand that, and I

17   asked the question how can you take the responsibility

18   away from the athletic director to supervise only one

19   of his folks -- one of his coaches, and wouldn't that

20   undermine his authority.

21           So that discussion went on.  And people were

22   saying well, it is no longer in his hands if there are

23   anymore problems.  Then the superintendent took on

(John Slyer)                                    9

1    that responsibility of supervising this coach.

2       Q.    Did the superintendent attend the meetings

3    at which this was discussed?

4       A.    He was there, yes.

5       Q.    Do you remember who was speaking about the

6    superintendent being the one who would be supervising

7    Mr. Earl?

8       A.    The superintendent was. He is the one who

9    presented that. And that was why my argument was that

10   this is not -- I didn't think it was an appropriate

11   chain of command.

12      Q.    When they made that presentation, did they

13   indicate a disagreement with the way Mr. Cioffi was

14   handling the Earl matter?

15      A.    At this time I don't recall the specifics of

16   that, but I would say there were members of the Board

17   that were critical of Mr. Cioffi, and, who, if it were

18   in their hands, would have liked to eliminate things

19   even early on then.

20      Q.    You mean eliminate what things?

21      A.    Eliminate the problems and change -- if they

22   didn't -- My impression was that they would have

23   chosen to end the dispute by eliminating both parties

(John Slyer)                                    10

1    if they could, but it didn't appear that they could.

2        Q.    So, in other words, eliminate both Mr.

3    Cioffi and Mr. Earl from the picture?

4        A.    Yeah.  And I don't know that they -- at that

5    point in time they didn't seem to have any real plan

6    to do that.  They were just initially indicating that

7    they were going to stop the problem by taking Mr.

8    Earl's supervision away from Mr. Cioffi.  And the

9    reason why I recall this is because I thought this was

10   just going to undermine the chain of command.

11       Q.    Did there come a time when Board members

12   decided to take action to resolve this problem?

13                      MR. SHAW:  Object to the form.

14            You can answer.

15       A.    Yes.

16       Q.    And why don't you describe how that came

17   about?

18       A.    As I recall, in October the question of

19   leadership within the athletic department started to

20   become in question.  And simultaneously -- and that

21   was coming into question by Board members, Board

22   leadership, in particular.  President and

23   Vice-president.  And it also was coming in from the

1    Assistant Superintendent, Jo Moccia and also Dr.

2    Johnson in that there was no leadership or there was a

3    lack of leadership in that area.

4              Interestingly that was around the same time

5    that it appears that some of the things that Mr.

6    Cioffi may have been critical with them about the new

7    events had been occurring.

8         Q.   Are you referring to the hazing?

9         A.   Yes.

10        Q.   Okay.

11        A.   And at that time it seemed to me that there

12   was already -- there were wheels in motion that were

13   starting to question his leadership ability within the

14   athletic department.

15        Q.   Which were the Board members who were

16   critical of Mr. Cioffi's leadership?

17        A.   Tom McGreevy, Erin Loffredo, Jennie Glasser.

18   You know, it is funny, because some of them kind of

19   just joined in on it.  It was like mob mentality, I

20   think.  But I think there were numbers of them that

21   were; others were as well.  The ones that were not

22   specifically critical of the leadership would be

23   myself and Neil Bonesteel.  The others were all either

(John Slyer)                                    12

1    ambivalent or kind of went along with it.

2        Q.    Did they at any point in time, in connection

3    with Mr. Cioffi's alleged lack of leadership in the

4    athletic department, express the view that he should

5    in some fashion lose his position as athletic

6    director?

7        A.    Yes.

8                    MR. SHAW:  Can we take a short

9            break.  I just want to talk to Mr. Slyer for

10           a moment.

11                   (Brief Recess.)

12                   MR. STECK:  Back on the record.

13   BY MR. STECK:

14       Q.    Mr. Slyer, I asked you about the Board

15   members.  Did the superintendent of schools Dr.

16   Johnson attend these meetings?

17       A.    Yes.

18       Q.    And what was his position in these

19   discussions?

20                   MR. SHAW:  Object to the form.  You

21           can answer.

22       A.    Could you be more specific?

23       Q.    Well, you had indicated I believe, if I

(John Slyer)                                13

1    recall your testimony correctly -- and correct me if

2    I'm wrong -- that Dr. Johnson had been advocating for

3    him supervising Mr. Earl instead of Mr. Cioffi; is

4    that correct?

5         A.    That is correct.

6         Q.    And then later on when the lack of

7    leadership issue came up, what was Dr. Johnson's

8    position on that?

9         A.    He was in agreement that there was a lack of

10   leadership.

11        Q.    What did they specify concerning lack of

12   leadership?

13                    MR. SHAW:  Object to the form.

14        A.    I guess the -- I'm trying to recall the

15   exact things, but one of the things was that he could

16   not get the football program under control.

17        Q.    Okay.  And what aspect of the football

18   program if any, according to him, were not under

19   control?

20        A.    The supervision of the coaches and the

21   evaluation of the coaches.

22        Q.    Was this opinion offered prior to the hazing

23   issue coming to the Board's attention?

(John Slyer)                          14

1          A.    Could that ask that question again.

2          Q.    Okay.  You had just testified that Dr.

3    Johnson felt Mr. Cioffi was having trouble controlling

4    the football program; is that correct?

5          A.    Yes.

6          Q.    Was Dr. Johnson offering that opinion to the

7    Board prior to the hazing incident coming to the

8    Board's attention?

9          A.    Yes, I believe so.

10         Q.    And after the hazing incident came to your

11   attention, what did Dr. Johnson tell the Board about

12   Mr. Cioffi's control or lack of control of the

13   football program?

14         A.    I can't recall at this time the specifics of

15   that.

16         Q.    What do you recall in sum and substance?

17         A.    That he was in agreement that there was a

18   lack of leadership and that the athletic director Mr.

19   Cioffi did not appear to have the ability to control

20   what was going on in the football program.

21         Q.    And did the Board members indicate whether

22   or not they shared that view?

23         A.    Yes.

(John Slyer)                              15

1        Q.    And was it again the same group of Board

2    members, other than yourself and Mr. Bonesteel, that

3    indicated agreement with that view?

4        A.    To the best of my knowledge, yes.

5        Q.    Now when was there first discussion of the

6    possibility of eliminating Mr. Cioffi's position as

7    athletic director?

8        A.    I guess the first time I recall anybody

9    saying anything to that extent was in probably June of

10   2001.

11       Q.    Do you know who said it?

12       A.    I think, yes, I believe I can recall who

13   said it.

14       Q.    Who was that?

15       A.    I believe it was Erin Loffredo.

16       Q.    And did she give a reason at that time for

17   seeking that result?

18       A.    Yes.

19       Q.    What was the reason she gave?

20       A.    She said that he was dead wood and that he

21   was costing us a great deal.

22       Q.    Did she indicate what she meant by the

23   statement that he was dead wood?

(John Slyer)                          16

1          A.    I don't recall at this time.

2          Q.    And when was the next time that you

3     recall -- well, strike that question.  Was this at a

4     Board meeting or was this in a private conversation

5     with you?

6                     MR. SHAW:  Object to the form.

7          Q.    Strike the question.  Was this at a Board

8     meeting when she made this statement?

9          A.    Yes.

10         Q.    And when was the next time that you heard

11    discussion of the possibility of eliminating Mr.

12    Cioffi's position?

13         A.    Late October.

14         Q.    And who raised it at that time?

15         A.    I believe it came from Erin Loffredo and Tom

16    McGreevy.

17         Q.    What did they say?

18         A.    I don't recall the specifics of their

19    dialogue, but they believed that we could move the

20    athletic program in a new direction if we had new

21    leadership.

22         Q.    Did they say -- Did they give any other

23    reasons for seeking or for advocating for the

(John Slyer)                    17

1    possibility of eliminating his position?

2         A.    Not at that time.

3         Q.    So I take it that there came a point in time

4    when they discussed the matter further; is that

5    correct?

6         A.    Yes.

7         Q.    And when was the next discussion after it

8    was mentioned in October?

9         A.    It was sometime in November or early

10   December.

11        Q.    And what did they say at that time?

12        A.    The cause of the hazing incident was brought

13   up as an example of lack of leadership and a need to

14   change the position in some way.

15        Q.    And did they continue to express that

16   opinion up until the time that the position was

17   actually eliminated?

18        A.    I can't answer that question completely.

19        Q.    What did they say between -- Well, when

20   approximately was that discussion that you just

21   mentioned?

22        A.    It occurred at some point in November or

23   December.

(John Slyer)                                      18

1      Q.    And then the position was eliminated at a

2  Board meeting I believe in late February; is that

3  correct?

4      A.    That is correct.

5      Q.    What happened in terms of Board discussion

6  of the possibility of eliminating Mr. Cioffi's

7  position between that meeting in November and December

8  and the elimination of the position in February?

9      A.    There was some further discussion in

10 January, and I was not privy to all of the discussion

11 after that point.

12     Q.    Were there Board meetings which you did not

13 attend?

14     A.    Yes.

15     Q.    How many?

16     A.    I don't know.  I wasn't there because I

17 wasn't informed of some of these meetings.

18     Q.    How typically were Board members informed of

19 meetings?

20     A.    Through our agendas and packets sent to us.

21     Q.    So they sent you packets in the mail; is

22 that correct?

23     A.    That is correct.

(John Slyer)                                      19

1       Q.    Did they typically telephone you before

2   meetings or not?

3       A.    No.

4       Q.    Did there come a point in time where you

5   raised with any member of the Board the question

6   whether you were being intentionally excluded from

7   Board meetings?

8       A.    Yes.

9       Q.    When did that happen?

10      A.    Well that happened in -- It happened

11  multiple times, starting formally, I would say, in

12  January or early February of 2002.  I don't have the

13  dates.

14      Q.    You are not expected to.  It is not a memory

15  contest.  Do you recall who you spoke to about that

16  issue?

17      A.    I guess can you be more specific with that

18  question?

19      Q.    Did you raise that question before a meeting

20  of the full Board, the issue of you being excluded

21  from Board meetings?

22      A.    Oh, yes.

23      Q.    What did you say?

(John Slyer)                                    20

1      A.    I challenged them that it was improper for

2      them to exclude me from Executive Sessions and that I

3      would take the proper action and be part of those

4      Executive Sessions.

5          Q.    Did they ever give you a reason, any members

6      of the Board give you a reason as to why you were

7      being excluded?

8          A.    Initially they did give me some reason.

9          Q.    What was the reason?

10         A.    They initially claimed they wanted to have a

11     meeting to discuss me.

12         Q.    Okay.  And did they indicate what they

13     wanted to discuss about you?

14         A.    Not initially.

15         Q.    Did there come a time when they indicated

16     what they wanted to discuss about you?

17         A.    Not specific, ever.

18         Q.    Did they ever say in sum and substance what

19     they wanted to discuss about you?

20         A.    I guess -- yes.

21         Q.    What was that?

22         A.    It appeared that some of them were looking

23     to try and have me removed from the school Board.

1    Q.   Did they ever indicate to you what grounds

2    they had for doing so?

3    A.   Yes.

4    Q.   What were the grounds that they offered?

5    A.   They claimed that I was acting outside of my

6    responsibilities as a Board member.

7    Q.   In what respect?

8    A.   In that I had tried to find out what was

9    going on with the athletic department and what was

10   going on with the hazing case.

11   Q.   What did you do to try and find out what was

12   going on with the athletic department and the hazing

13   case?

14   A.   I tried follow up on information that

15   committee members had provided me.

16   Q.   What was the information?

17   A.   That a young man had been tea-bagged, and

18   that was, you know.  That was the point I was trying

19   to find out what was really going on.

20   Q.   How did the question of tea-bagging first

21   come to your attention?

22   A.   At some point in October at a Board meeting

23   it was brought to our attention that something had

1    happened.

2         Q.    Did they tell you specifically at that time

3    that there was an allegation that tea-bagging had

4    occurred?

5         A.    Initially, no.

6         Q.    Did you find out in October that tea-bagging

7    had occurred?

8         A.    Yes.

9         Q.    How did you find out?

10        A.    Information from committee members and other

11   information that did come later from the assistant

12   superintendent and superintendent.

13        Q.    When did you find out, to the best of your

14   recollection, what the identity was of the person who

15   was tea-bagged?

16        A.    Sometime in October.

17        Q.    Did you find out it to be a person known as

18   Mitchum White?

19        A.    Yes.

20        Q.    Were you given the identity of that person

21   at the Board meeting?

22                        THE WITNESS:  Can I stop for one

23              second?

(John Slyer)                                          23

1                    MR. STECK:   Sure.

2                    THE WITNESS:   I don't want to put

3          this kid's name out there.

4                    MR. STECK:   It is already out

5          there.

6                    MS. BOURASSA:   Mitchum's name is

7          out there.

8                    THE WITNESS:   I know.  But I just

9          don't want to be the responsible party.

10                   MS. BOURASSA:   You are not.

11                   MR. STECK:   You are not.

12                   THE WITNESS:   Can you restate the

13         question?

14   BY MR. STECK:

15       Q.    Was the identity of the person Mitchum

16   White?

17       A.    Yes.

18       Q.    Was anything said at a Board meeting

19   concerning whether parents should be told about the

20   incident of tea-bagging?

21       A.    Yes.

22       Q.    What was said?

23       A.    I insisted that the parents should be

(John Slyer)                                    24

1    notified immediately.

2         Q.    What was said in response?

3         A.    What was said is that our attorneys are

4    advising us.

5                        MS. BOURASSA:   Objection.  I am

6              going to direct the witness not to disclose

7              legal advice provided by the counsel for the

8              District.  The privilege belongs to the

9              District and the Board of Education as a

10             whole, and not to Mr. Slyer.

11                       MR. STECK:  Yes.  We understand

12             that.

13   BY MR. STECK:

14        Q.    Apart from relating any advice of counsel.

15                       THE WITNESS:  I am a little

16             confused about what just went on.

17                       MR. SHAW:  You don't have to worry

18             about it.

19                       MR. STECK:  But I think we do, the

20             lawyers in the case.  He doesn't.  But we

21             are going to rephrase the question.

22   BY MR. STECK:

23        Q.    Mr. Slyer, without revealing any advice of

1    counsel that the Board may or may not have received,

2    were you told that you were not to reveal this to the

3    parents?  Let's start with that.

4         A.    Specifically I was not told.

5         Q.    We will get to that.

6         A.    Could you rephrase that question?

7         Q.    Yes.  Did the Board make a decision, either

8    formally or informally, as to how notification of the

9    parents would be handled?

10        A.    No.

11        Q.    So did the Board decide not to notify the

12   parents?

13                    MR. SHAW:  Objection to the form.

14        A.    I guess the answer to that question is the

15   Board did not seem to be making any of the decisions

16   related to that matter at that time.

17        Q.    Was the superintendent --

18        A.    It didn't appear so at that time.

19        Q.    Did your attorneys ever attend a Board

20   meeting at that time?

21        A.    Yes.

22        Q.    Were they giving you advice at the Board

23   meetings as to what you should do?

(John Slyer)                                    26

1       A.    Yes.

2                       MS. BOURASSA:   When you say "at

3               that time," what time?   October?

4    BY MR. STECK:

5       Q.    We are talking about October when the

6    Mitchum White issue first came to a head, are you

7    thinking?

8       A.    Yes.

9       Q.    Was there discussion on the Board concerning

10   whether a victim had been identified or not?

11      A.    Yes.

12      Q.    And without talking about what attorneys

13   said, what was the discussion on the Board concerning

14   the identity of the victim?

15      A.    Initially the identity of the victim was not

16   disclosed.

17      Q.    Was it your understanding that they knew who

18   the victim was but they were just not disclosing it?

19      A.    Yes.

20      Q.    And from whom did you derive that

21   understanding?

22      A.    I think -- I believe it was at this time the

23   assistant superintendent.

1      Q.    Other than advice of counsel, did the

2      assistant superintendent give my reason why the

3      victim's name should not be disclosed to you?

4      A.    No.

5      Q.    Was there any discussion in October when

6      this question of the victim first came about as to the

7      possibility of notifying the New York State Police?

8      A.    Restate that question.  I'm sorry.

9      Q.    When the identity of the victim was being

10     discussed, was there any discussion on the Board

11     concerning whether or not to notify the New York State

12     Police?

13     A.    Yes.

14     Q.    And, again, without saying anything as to

15     the advice of attorneys, what was said by Board

16     members concerning whether or not to notify the New

17     York State Police?'

18     A.    That's such a big question.  Can you be more

19     specific with that question?

20     Q.    I will do as good as I can.  Remember, I

21     don't know what happened.  When was the first time

22     that you recall someone making a suggestion that

23     perhaps the New York State Police should be notified?

(John Slyer)                                    28

1        A.    It was in October.

2        Q.    Who made the suggestion?

3        A.    I did.

4        Q.    And what prompted you to make that

5   suggestion?

6        A.    The facts that were presented to me.

7        Q.    Did either Mr. Cioffi or Mrs. Noonan tell

8   you that they thought the New York State Police should

9   be notified?

10                    MR. SHAW:  Are you talking about

11             at this time?

12        Q.    In October?

13        A.    At that time, when I brought it up, I had no

14   contact with them.

15        Q.    What did you say about the New York State

16   Police at the Board meeting?

17        A.    I said that we should contact the State

18   Police -- New York State Police and have them assess

19   the legitimacy of this claim rather than doing an

20   internal investigation ourselves and that we weren't

21   experts.

22        Q.    Other than relating what attorneys may have

23   said, what was the response to your suggestion?

1        A.     The response was that they were going to

2    follow -- they were going to continue on the same path

3    they were making.  They were not necessarily going to

4    notify.  At least this is the initial conversation.

5    It progressed throughout October.

6        Q.     How did the conversation concerning the

7    issue of the State Police progress over time?

8        A.     Well, at one of the -- As I recall at this

9    time at one of the Executive Sessions I insisted that

10   we at least contact the New York State Police to have

11   them informed of the report, and that --

12       Q.     Whose report?

13       A.     The report.  The young man's report of the

14   hazing.  And there was a lot of resistance to it.  I

15   insisted.  I said we really have to.  The Board

16   president was not present at that meeting, as I

17   recall.  The rest of the Board went with it.

18       Q.     Agreed with you?

19       A.     Agreed to contact the authorities.  And one

20   of the things that I asked for in the assurance was

21   that we get some information back by that following

22   Friday, which we did not.

23       Q.     Is it your understanding that the Board

(John Slyer)                                        30

1    president intervened in that time?

2         A.    Yes, it is.

3         Q.    And what happened?

4         A.    He directed the superintendent not to call.

5         Q.    Had the Board taken a formal vote to call

6    the New York State Police?

7         A.    I interpreted the vote that was taken in

8    Executive Session as a formal vote.

9         Q.    When you say "interpreted," exactly what

10   happened?  Was there a show of hands?

11        A.    Uh-huh.

12        Q.    "Yes?"

13        A.    "Yes."

14        Q.    So it is your testimony in essence that Mr.

15   McGreevy intervened subsequent to that vote and

16   stopped a vote of the Board -- stopped what the Board

17   had authorized from taking place; is that correct?

18        A.    Yes.

19        Q.    How would you describe -- strike that.  Was

20   there a difference in the degree of interaction that

21   you had as a Board member with the superintendent and

22   the degree of interaction which Mr. McGreevy had with

23   the superintendent as a Board member?

(John Slyer)                              31

1        A.    Yes.

2        Q.    How would you describe that difference?

3        A.    Mr. McGreevy had frequent meetings with the

4    superintendent on a regular basis without other Board

5    members present.

6        Q.    Were there any other --

7        A.    Possibly there were other Board members

8    present; I don't know.

9        Q.    Never with you present?

10       A.    Not that I recall.

11       Q.    Are you aware of any other Board members who

12   attended meetings with the superintendent together

13   with Mr. McGreevy?

14       A.    Yes.

15       Q.    Who?

16       A.    Erin Loffredo.

17       Q.    Anyone else?

18       A.    Depending at what time you are speaking.   If

19   we're speaking in October and before that point I

20   don't know have any others, but it is possible.

21       Q.    Were you, as a member of the Board, ever

22   told whether or not you should have contact with Mr.

23   Cioffi or Mrs. Noonan?

(John Slyer)                                    32

1      A.    Initially when I took office, no.

2      Q.    Did there come a time when that occurred?

3      A.    Yes.

4      Q.    When did that happen?

5      A.    I believe it was at some point in November

6   2001.

7      Q.    What were you told about contact with Mr.

8   Cioffi or Mrs. Noonan?

9      A.    That I was not allowed to speak to them

10   regarding any matters related to the school district.

11      Q.    Who told you that?

12      A.    The Board president and superintendent.

13      Q.    Let's go back to -- We have jumped around a

14   little bit.  We are going to go back over some of the

15   details as we move on, but let's go back now to the

16   New York State Police involvement.  And you had

17   previously testified the Board had voted to involve

18   the State Police in some fashion and that Mr. McGreevy

19   had put a stop to that.  How did Mr. McGreevy's

20   intervention come to your attention?

21      A.    I believe I received an e-mail in response

22   to my questioning what is going on.

23      Q.    Who did you write an e-mail to?

(John Slyer)                                          33

1       A.    I believe it was either the superintendent

2   or Mr. McGreevy himself.  I can't recall.  It may be

3   carboned to both of them.  I can't recall.

4       Q.    Did you bring with you any copies of any

5   e-mails?

6       A.    No.

7       Q.    Do you still have e-mails?

8       A.    I don't know if I have those e-mails any

9   longer.  I don't think I was --

10                     MR. SHAW:  Wait for a question.

11      Q.    Have you been asked my counsel or by anyone

12  at the school district to produce any e-mails in

13  connection with this lawsuit?

14      A.    At some point I believe I was.

15      Q.    And have you done so?

16      A.    I have not. I haven't found them and I

17  haven't had time to find them.

18      Q.    So you sent an e-mail and you received a

19  response; right?

20      A.    I believe I did.  The question -- it

21  partially may have been a phone call.  Some of that

22  contact right there.  I'm just questioning my own

23  memory. It was either an e-mail or phone call.

(John Slyer)                                34

1       Q.      Whatever it was, you did receive a response

2    to your request to know what was going on?

3       A.      Yes.

4       Q.      Who responded?

5       A.      Mr. McGreevy initially.

6       Q.      What did he tell you?

7       A.      That they were not going to contact -- at

8    least at that time.

9       Q.      The New York State Police?

10      A.      Yes.

11      Q.      Now did you speak to the superintendent

12   about the issue?

13      A.      Yes.

14      Q.      What did he tell you?

15      A.      He told me that he was doing what he was

16   told.

17      Q.      What he was told by whom?

18      A.      By Mr. McGreevy.

19      Q.      Now --

20      A.      And maybe others, but ...

21      Q.      Did there come a time when the State Police

22   were contacted?

23      A.      Yes.

(John Slyer)                                    35

1        Q.    Why don't you describe what you were told

2    concerning the involvement of the State Police?

3        A.    We met again for an emergency Executive

4    Session.

5        Q.    Do you know the timeframe?

6        A.    A week after that initial decision.  And it

7    was at that time that I told the Board that it was --

8    that we really had a legal responsibility to do so.

9        Q.    That was based on your experience as a

10   teacher?

11       A.    Yes.  And my experience in training as a

12   School Board Member through --

13       Q.    Through New York School Board Association?

14       A.    Association, and literature that I read.

15       Q.    And was your suggestion ultimately adopted?

16       A.    Yes.

17       Q.    Was it adopted at that meeting?

18       A.    I believe so.

19       Q.    What was your understanding of what the

20   District was going to ask the State Police to do?

21       A.    I believe that they were going to contact

22   the State Police and give them the information about

23   what had transpired.

(John Slyer)                                    36

1          Q.    Including who the victim was?

2          A.    Yes.  And they were going to give us what --

3     you know, they would get feedback from the State

4     Police.

5          Q.    Did there come a time when you heard from

6     the State Police?

7          A.    Yes.

8          Q.    And did the State Police appear at a Board

9     meeting?

10         A.    Yes.

11         Q.    Was that Senior Investigator Komar?

12         A.    Yes.

13         Q.    And Investigator Kylie?

14         A.    Yes.

15         Q.    What did they tell the Board?

16         A.    I believe they told them to stop their

17    investigation and that the police were going to begin

18    an investigation.

19         Q.    What did the Board say in response?

20         A.    Accepted it, as far as I can recall.

21         Q.    Did the State Police ever make a report to

22    the Board concerning the results of their

23    investigation?

(John Slyer)                                    37

1        A.    I don't recall at this time.

2        Q.    Did there come a time when faculty members

3    of the District were arrested in connection with the

4    hazing investigation?

5        A.    Yes.

6        Q.    Was that discussed at a Board meeting?

7        A.    Yes.

8        Q.    What was discussed about those arrests?

9        A.    I don't recall the details of the

10   discussions, except the fact that the State Police

11   were going in that direction.  And I didn't get any

12   other information other than what the facts were from

13   the State Police.

14       Q.    Did the Board discuss the possibility of any

15   school initiated disciplinary action against the

16   teachers involved?

17       A.    No, not that I recall.

18       Q.    Was there any discussion of Mr. Earl's

19   responsibility for the hazing situation on the Board?

20       A.    Yes.

21       Q.    When do you recall the question of Mr. Earl

22   first being raised concerning hazing?

23       A.    At some point in October.

(John Slyer)                                    38

1      Q.    What was said about Mr. Earl?

2      A.    He was the one who was responsible for

3   supervision of his staff, and ultimately that was what

4   I think everyone was in agreement with.

5      Q.    Was there ever any discussion concerning the

6   Board as to whether -- well, did it come to your

7   attention at some point in time that Mr. Cioffi had

8   recommended that Mr. Earl not be re-appointed as

9   football coach?

10     A.    Yes.

11     Q.    Did that come to your attention while you

12  were on the Board in the summer of 2001?

13     A.    Yes.

14     Q.    And did Dr. Johnson say that he had not

15  accepted Mr. Cioffi's recommendation?

16     A.    I believe so, yes.

17     Q.    There were a variety of allegations that had

18  been made concerning certain activities that Mr. Earl

19  had engaged in that were improper; is that correct?

20     A.    Yes.

21     Q.    Was there ever any discussion on the Board

22  of the relationship between the alleged improper

23  activities of Coach Earl and the hazing incident?

(John Slyer)                              39

1        A.    Could you restate that?

2        Q.    Okay.  Was there ever any discussion on the

3   Board concerning whether the various alleged improper

4   activities of Mr. Earl led in any way to an

5   environment that created where hazing could occur in

6   the football locker room?

7        A.    Yes.

8        Q.    Who raised the issue?

9        A.    A number of people did.

10       Q.    What did they say?

11       A.    People were concerned that the environment

12   was cult-like, and that the idea that everything that

13   is said in the football program stays only in the

14   football program.  That was one of the big concerns

15   that people were worried about.

16       Q.    Who were the people that raised that issue?

17       A.    Assistant superintendent, superintendent,

18   and Board members.

19       Q.    Including yourself?

20       A.    Oh, yeah.  Yeah.

21       Q.    Were there other Board members who raised

22   that issue?

23       A.    Yes.

(John Slyer)                                    40

1       Q.    Do you recall who they were?

2       A.    Yes.

3       Q.    And who were they?

4       A.    At least I recall hearing that from Erin

5    Loffredo at one point.

6       Q.    When did you first hear the phrase

7    "cult-like" in reference to the football team?

8       A.    I don't recall the specific time that I

9    heard that, but it was before October.  It was -- I

10   think it was maybe even in September at some point.

11      Q.    Did you hear that from coaches or from Mr.

12   Cioffi at that time?  When you first heard it, what

13   was the source of it when you first heard it?

14      A.    It was in Executive Session.

15      Q.    Used that phrase?

16      A.    Yes.

17      Q.    Another member of the Board?

18      A.    It may have been another member of the Board

19   or the administration.  I can't recall exactly

20   offhand.

21                  MR. STECK:  Do you want to take

22             a five-minute break?

23                  THE WITNESS:  Yes.

1               (Brief Recess.)

2    BY MR. STECK:

3        Q.    Were the school district's attorneys ever

4    given a role by the Board of investigating the hazing

5    incident?

6        A.    Yes.

7        Q.    And what role were they given?

8        A.    I believe they questioned witnesses.

9        Q.    And did they report to the Board concerning

10   what they had found?

11       A.    I believe in some form, yes.  I don't recall

12   the details of it.

13       Q.    Do you recall what they said to the Board

14   concerning their investigation of the hazing?

15                    MS. BOURASSA:  Objection.  I am

16             going to object to that questions that call

17             for the witness to tell what the attorneys

18             advised the Board if anything about the

19             hazing investigation.

20                    MR. STECK:  The hazing investiga-

21             tion and the facts investigated by counsel

22             are not privileged.  There is a whole line

23             of case law that says so.  And that is the

(John Slyer)                          42

1        road I am going down.

2                   MS. BOURASSA:  You are going

3            down --

4                   MR. STECK:  Factual investigation

5            by the attorneys.  That is different from

6            legal advice.

7                   MS. BOURASSA:  Yes, it is.

8                   MR. STECK:  That is what I'm asking

9            him about.

10                  MR. SHAW:  You are just asking then

11           what factually was conveyed, not anything

12           about legal conclusions, advice, impressions

13           or anything like that.

14                  MR. STECK:  That is correct.  All I

15           am asking about is the report of what their

16           factual findings were to the Board.

17                  MR. SHAW:  If you can recall.

18       A.    I recall some factual information being

19   reported.

20       Q.    What factual information was that?

21       A.    That a tea-bagging incident had occurred,

22   and that was -- I guess that's the information that

23   had occurred, and that was a fact.

(John Slyer)                                    43

1      Q.   Did you have any understanding -- Well, do

2   you remember at what point in time that was reported

3   to the Board?  Was that in October?

4      A.   I believe it was October.  At some point in

5   October, later October.

6      Q.   Now in October did you have any under-

7   standing as to whether Mr. Cioffi had played any role

8   in the hazing investigation?

9      A.   Yes.

10     Q.   What was your understanding in October?

11     A.   That he had reported it to the assistant

12  superintendent and the superintendent what information

13  he had.  That's what I understood.

14     Q.   In October did you have any understanding

15  that in fact Mr. Cioffi had met with any witnesses or

16  victims of the hazing?

17     A.   I don't know if it was October, but at some

18  point I believe he had met with a witness and the

19  assistant superintendent.  I believe that's what

20  happened.  And I was there, but I believe that is

21  what was reported.

22     Q.   Was it your understanding that there were

23  any legal obstacles to reporting -- Well, prior to